IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                        No. 04-20070 B

WILLIAM NEVILLES,

    Defendant.

---

ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

---

INTRODUCTION AND PROCEDURAL BACKGROUND

The Defendant in this matter, William Nevilles, has been charged, in a three-count indictment entered February 17, 2004, with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), possessing with intent to distribute crack cocaine in violation of 21 U.S.C. § 841, and using a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c). Before the Court is the motion of the Defendant to suppress evidence obtained pursuant to a search warrant issued on January 26, 2004 for his residence at 528 Bon Air in Memphis, Tennessee. On August 3, 2004, Nevilles filed a motion for a hearing pursuant to Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), which was referred to the magistrate judge, who conducted an evidentiary hearing on September 9, 2004. Based on the proof presented at the Franks hearing, the Defendant, on November 19, 2004, moved to suppress evidence obtained pursuant to the search warrant. Additional testimony was heard by the undersigned on February 24, 2005 and the parties have filed post-hearing briefs. The motion to suppress is, therefore, ready for disposition.



## FACTUAL BACKGROUND

In November 2003, Tammy Simpson and her husband were arrested in connection with numerous residential thefts in Shelby County, Tennessee. After her arrest, Simpson told Shelby County Sheriff's Department officers where at least some of the property could be recovered from at least five different locations. She also informed officers that a person known as "Dead-Eye" was trading drugs for stolen property. In early 2004, Simpson contacted the sheriff's department concerning the trade of a pistol for narcotics. She telephoned the Defendant in order to obtain a phone number for Dead-Eye to see if he wanted to buy the pistol from her. Subsequently, Nevilles expressed interest in purchasing the gun himself.

Following a series of telephone calls between Simpson, who was acting as an informant, and Nevilles, some of which were monitored by sheriff's officers, a deal was struck involving an exchange of cash and cocaine for the firearm. The trade was to take place on January 26, 2004 at the Defendant's home on Bon Air, where Simpson had purchased drugs from him on 50 to 100 prior occasions. On that same date, officers Gary Helms and Larry Lindsey interviewed Simpson in preparation for obtaining an anticipatory warrant that would allow them to search the house in the event the deal proceeded as planned. The warrant affidavit was actually prepared by Lindsey while the information contained therein came primarily from Helms. As it was his first, Lindsey used a sheriff's department form with boilerplate language. On the day the affidavit was prepared, the operation was nearly abandoned temporarily when members of the SWAT team scheduled to participate in the Nevilles search were shot in a previous incident.

Simpson told the officers during the interview that, when she had previously purchased drugs at Nevilles' home, she walked up to a certain window and passed money to the Defendant, who was

2

inside. He then passed drugs out through the same window. The gun to be used in the exchange was provided to her by the sheriff's department. The informant went to the Bon Air address, handed the gun to Nevilles through the window and received by the same method cash and cocaine. At that point, the Defendant was arrested and his home searched.

## ANALYSIS

The Fourth Amendment requires that warrants be issued based on probable cause and supported by oath or affirmation. U.S. Const. amend. IV; United States v. Rodriguez-Suazo, 346 F.3d 637, 644 (6th Cir. 2003). "In order for a judicial officer to issue a warrant, law enforcement officials must present evidence from which the [issuing] judge can conclude from the totality of the circumstances, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Woosley, 361 F.3d 924, 926 (6th Cir. 2004), reh'g en banc denied (May 28, 2004) (citations and internal quotation marks omitted). In Franks, the Supreme Court recognized the right of a criminal defendant to challenge the sufficiency of a previously issued and executed warrant on the grounds that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." Franks, 438 U.S. at 155-56, 98 S.Ct. at 2676. If "the defendant can show by a preponderance of the evidence that the affiant either knowingly or with reckless disregard included [such a] statement in the affidavit, then any evidence and fruits of the search would be excluded." Rodriguez-Suazo, 346 F.3d at 648. "When law enforcement officials have acted unreasonably, the exclusionary rule [articulated in the Fourth Amendment] exists to suppress evidence gained through unconstitutional means." Id. at 644.

The Court is instructed to review a search warrant affidavit in a "commonsense--rather than a hypertechnical--manner," and should consider "whether the totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny." Woosley, 361 F.3d at 926. The issuing judge's determination as to probable cause is to be afforded "great deference" and should be overturned "only if [he] arbitrarily exercised his discretion." Id.

The affidavit presented to the state court judge in this case contains the following statement:

> Personally appeared before me Patrolman Kevin Helms and made oath that he has good ground and belief, and does believe that a male black William Nevilles A.K.A. "Bill" is in possession of the following described property, to wit: Crack Cocaine, Drug Proceeds, Drug Records, and handguns (Beretta Model 92FS Stainless Steel Semi-Automatic S/N L73232Z) contrary to the laws of the State of Tennessee, upon the following described premises, to wit: a single family dwelling at 528 Bon Air Memphis, Tennessee 38112. This search is to include all vehicles and outbuildings on the premises and his reasons for such belief are that affiant has received information from a reliable informant who has been proven by affiant to be reliable in the past. This informant has been responsible for five separate incidents of recovering stolen property. This reliable informant advised Patrolman Helms that within the past five days, of January 26, 2004, the reliable informant has seen William Nevilles selling the storing cocaine (crack) inside of 528 Bon Air Memphis TN 38112. This informant advised that William Nevilles agreed to trade a Beretta Model 92FS Stainless Steel Semi-Automatic S/N L73232Z in exchange for $250.00 Cash, and approximately $50.00 in Crack Cocaine. On January 26, 2004 at approximately 1252 hours, the Informant called William Nevilles at phone number 901-503-5121 and he again agreed to the above mentioned trade, and the call was over heard by Patrolman L. D. Lindsey S-3001. William Nevilles is a convicted felon being that he was convicted in Criminal Court Division 04 for Aggravated Assault. Once William Nevilles has made the anticipated trade of money and Cocaine for the Beretta Model 92FS Stainless Steel Semi-Automatic S/N L73232Z handgun the search warrant will be executed. He therefore asks that a warrant issue to search the person and premises of the said William Nevilles as above described in said County, where he believes said is now possessed, contrary to the Laws of Tennessee.

(Mot. to Suppress, Ex.) The Defendant argues that the following statements were false: (1) that Nevilles was at the time the warrant was sought in possession of the Beretta; (2) that the informant,

4

Tammy Simpson, had provided information concerning five separate incidents of criminal activity; and (3) that Simpson had seen Nevilles selling and storing cocaine at his residence within five days of January 26, 2004. The Court will address each of the allegedly false statements seriatim.

The warrant at issue has been described by the Government as an anticipatory warrant, that is, "a search warrant that by its terms takes effect not upon issuance but at a specified future time." See United States v. Miggins, 302 F.3d 384, 395 (6th Cir. 2002), cert. denied, 537 U.S. 1130, 123 S.Ct. 909, 154 L.Ed.2d 817 (2003) (citations and internal quotation marks omitted). As the Sixth Circuit observed in Miggins, "[a]lthough courts have required that conditions triggering the anticipatory search warrant be explicit, clear, and narrowly drawn," a commonsense reading of the warrant and its supporting documents is to be made. Id. (citations and internal quotation marks omitted).

The Defendant argues that Helms' statement in the affidavit that the Beretta "is" in his possession when it was at the time the warrant was sought in the possession of the sheriff's department was an intentional or knowing attempt to mislead the state judge into believing that Nevilles was a convicted felon in possession of a firearm at the time the warrant was issued. Therefore, he contends, the warrant as sought by Helms authorized an *immediate* search of the Bon Air home.

There was, however, no evidence presented to the Court to indicate that the use of the word "is" constituted a "knowing and intentional" false statement. While the wording of the affidavit could have been more accurate, the Court is reminded of its duty to analyze the affidavit in toto, rather than word for word. In reading the entire warrant affidavit, it is clear that the warrant did not authorize an immediate search, but was anticipatory in nature and identified the triggering event,

5

based on statements that the Defendant had *agreed to* trade for a weapon and that "[o]nce William Nevilles ha[d] made the anticipated trade of money and Cocaine for the Beretta Model 92FS Stainless Steel Semi-Automatic S/N L73232Z handgun the search warrant will be executed." (Mot. to Suppress, Ex.) Instead of an intentional falsehood, the evidence suggests a simple mistake, due to Officer Lindsey's lack of experience in preparing anticipatory warrants and the distraction caused by the shootings of their fellow officers. The officers believed the warrant to be anticipatory and undisputedly acted accordingly, not moving in to make the arrest until after the informant had traded the Beretta for the cash and drugs. Accordingly, suppression is not appropriate. See United States v. Ware, 338 F.3d 476, 482 (6th Cir. 2003) (no constitutional violation where supporting affidavit noted that controlled delivery would be made that afternoon and officers executed the warrant in belief it was anticipatory, waiting for the triggering event to occur, even though the warrant application inadvertently authorized an immediate search of premises).

The remaining two issues raised by the Defendant will be analyzed in tandem as both involve the veracity of the informant, Tammy Simpson. Nevilles contends that Helms intentionally exaggerated the reliability of the informant in order to mislead the issuing judge into signing the warrant. At the Franks hearing, Simpson testified that she had provided information to Helms, along with his supervisor, in November 2003 with respect to illegal activities involving herself and her husband. She denied having given information to Helms or Lindsey on five separate occasions, as was stated in the warrant application, but acknowledged on cross-examination by the Government that information she proffered concerned property stolen from numerous individuals which was located in five or more different locations. Simpson further denied that she went to the Bonn Air address within five days of January 26.

6

Helms was also called as a witness at the hearing, where the following testimony was heard in connection with his prior dealings with Simpson:

> Q: There was no incident of Ms. Simpson ever working as an informant involving other people; was there?
>
> A: Yes, there was. But, she got more property for us by talking to people and going out on the streets and finding out on more thefts that other people were involved in.
>
> Q: In your affidavit, you stated that she was reliable for or responsible for giving information that led to five separate incidents of recovering stolen property; is that true?
>
> A: Yes.
>
> Q: And were those five separate incidents all incidents in which her and her husband were involved or did it involve other individuals?
>
> A: Other individuals.
>
> Q: So, if Ms. Simpson testified that she had only provided information on herself and her husband relating to stolen property, would that be true or false?
>
> A: Well, she gave me information on where it was at. If she was there, we didn't know about it. If she was there, she gave us information where people had pawned items that she knew about. And we were able to track it through the pawn shops. That came true.
>
> Q: Was it property she had stolen?
>
> A: No.

(Hrg. tr. at 34-35.) As to her presence at the Nevilles home, Helms stated thusly:

> Q: Now, you stated in your Affidavit that this informant, which would be Ms. Tammy Simpson, had advised you that within the past 5 days of January 26, 2004 that she had seen William Nevilles selling crack cocaine inside of 528 Bonn Air. Is that statement true?
>
> A: Yes.

7

Q: When did she tell you that she had been inside of that residence?

A: She did not give a specific date. I think, the way that the conversation went, it was between myself, Lieutenant Clark and Detective Lindsey. And we asked a series of questions concerning this subject in order to obtain a warrant, an anticipatory warrant. And one of the questions that was asked was, "Have you seen any do[p]e over there? Or have you bought dope from him? And what kind? And there were several other questions asked, many questions asked.

Q: And she had advised you that she had bought dope many times at that house; is that correct?

A: Yes.

Q: And did she tell you that she had been within -- there within 5 days of January 26th?

A: Yes.

Q: And which indicates what date?

A: She didn't -- I don't recall a date.

Q: And how do you know that you asked her that question?

A: Lieutenant Clark asked the question.

Q: And did she describe to you what the inside of 528 Bonn [sic] Air looked like?

A: Described it? She said, that she has never went inside of the residence. The way that she described it was that she goes to the window. When you pull into the driveway, there is a window. And he would actually get the dope out and give it to her through the window and change, while he was inside of the house.

Q: And this informant, had she been honest and forthcoming to you and with you throughout this investigation?

A: Yes.

Q: And as far as recovering the stolen property, has her information proven true and reliable?

8

> A: Yes.
>
> Q: And you had no reason to not believe Ms. Simpson, if she tells you something?
>
> A: Everything she told us came through.
>
> \* \* \*
>
> Q: And if she testified today that she had never told you that she had been inside of 528 Bonn [sic] Air within 5 days of January 26th, would that be true or would it be false?
>
> A: Unless she misunderstood the questions that we were asking her -- like I said, we asked her many questions. And that question was asked.
>
> Q: So, if Ms. Simpson testified today that she had never told you that she had been in 528 Bonn [sic] Air within January 26th, would that be consistent with the information that you had in this case?
>
> A: She told us -- we asked her several questions concerning this. And we wanted to get all of the technicalities out of the way before we got this warrant. And it was going to be an anticipatory warrant anyway. And those are the facts that she had stated.

(Hrg. tr. at 35-38.) On examination by the Government's attorney, Helms recalled that Simpson was interviewed by several different law enforcement officers at the main police office at 201 Poplar Avenue in Memphis and remained there the entire day. During that time, information was received concerning the shootings of the two SWAT officers. The following testimony was also adduced:

> Q: Okay. And did she describe in detail purchases that she had made from the Defendant at that address?
>
> A: Yes.
>
> Q: Okay. Now, is your memory of your questioning her, that she stated that that occurred within five days of you getting this warrant?
>
> A: Yes or else I wouldn't have put that in there.
>
> Q: Okay. And is that something that you specifically question witnesses about?

9

A: Yes.

Q: Okay. Now, when was the first time you became aware that it was her position she had not been there within five days of this warrant?

A: A couple of hours ago.

Q: Okay. And was that this morning when she was being interviewed for this hearing?

A: Correct.

Q: Okay. Did that position come as a surprise to you?

A: Very much so.

Q: Okay. Let me ask you this. Given the people that were questioning her, okay, and the time period that was involved in this day and the events of that day including the officers being shot, do you think that it is possible that either that you misunderstood her answer or that she misunderstood the question that you was describing prior that you mistook for recent drug buys?

A: It could have been a little bit of both. Lieutenant Clark, specifically, asked that question on that, concerning that since it was his unit being involved. We were all asking her questions, you know, pertaining to this warrant.

Q: And would you say that Lieutenant Clark is really famous for being really big on asking that five-day question?

A: Oh, yes.

Q: Okay. But, it's not just that you are relying on pattern and practice asking that question, you have a specific memory of him asking that question?

A: Right. He wouldn't let us do it.

Q: Okay. Now, did she describe to you phone calls that she had had with the Defendant during that five-day period?

A: Yes.

(Hrg. tr. at 62-64.)

\* \* \*

10

> Q: Okay. I want to make absolutely certain, would you tell the Court that it was your belief that she stated that she had been in that house [on Bon Air] within the five days?
>
> A: Yes.
>
> Q: Okay. Now, this is just for you to tell the Judge. I am not trying to put words in your mouth either way. When you heard her say earlier today that she hadn't been in that house in five days, was it your impression that she was lying to you at the time or was it your impression that there was a type of misunderstanding or confusion? And that's for you to access [sic] for the Judge.
>
> A: After further talking to her, I think it was a misunderstanding because every questions that we asked her regarding that whole day of questioning with Lieutenant Clark there, with Lindsey there, and myself there, every question was the same questions that we had asked her that day. She remembered all of those questions. Yes. I think it was a misunderstanding.

(Hrg. tr. at 66.)

\* \* \*

> Q (defense counsel): Now, when Tammy Simpson spoke with you regarding William Nevilles, did she advise you that she had never been to his residence since November 12th of 2003?
>
> A: Not in our investigation, no.
>
> Q: And she did not tell you that that was the last time that she had actually been there?
>
> A: No.

\* \* \*

> Q: And it is your testimony that she told you that she had been there within five days of January 26th?
>
> A: Correct.
>
> Q: And you talked with her earlier today, and she told you that she hadn't told you that?

11

> A: That's right.
>
> Q: She never lied about any of the 50 to 100 times of being there. And it is just this one time that you and her are not on the same page; isn't that correct?
>
> A: Correct.
>
> Q: And every dealings that you had with Ms. Simpson, she has been honest in her dealings with you in providing you information that you have no reason not to believe; isn't that correct?
>
> A: That's right.

(Hrg. tr. at 70-71.) The relevant testimony taken from Officer Lindsey included the following.

> Q: [In the criminal complaint] that is no mention in this of any contacts between the CI [confidential informant] and Mr. Nevilles between the 20th and the 26th; correct?
>
> A: Correct.
>
> Q: And to your knowledge, had there been any contact between the CI and Mr. Nevilles between those two dates?
>
> A: Between those two dates?
>
> Q: Yes, sir.
>
> A: Any contact whatsoever?
>
> Q: Any contact that you were aware of?
>
> A: Based on our interview, she indicated that she had been at Mr. Nevilles prior to the 26th within a five-day period.
>
> Q: She told you that?
>
> A: Yes. That was in the interview that was conducted after Detective Helms brought her up to our office.
>
> Q: And was that interview in your presence?
>
> A: Yes, sir.

12

Q: And was that interview recorded?

A: No, sir.

Q: Were there any notes that you took during this interview?

A: No.

Q: Would any other officers had taken notes during that interview?

A: Well, as far as the interview itself, no, because what we did is we, my supervisor, myself and Detective Helms, were interviewing her in his office. And we was going over what information she had provided at that time.

Q: How can they say today in September of 04 that this is what she told you in January of 04, if you don't have any notes?

A: Because I documented it in the search warrant.

Q: Did you prepare the search warrant?

A: I actually typed the search warrant.

\* \* \*

Q: And the information that was provided in the warrant was information that Mr. Helms had gathered through his investigation?

A: Through everybody's, of the interviews, and the interview that we had, and everything else.

\* \* \*

Q: Mr. Lindsey, were you present prior to this deal on the 26th? Prior to the deal going down on the evening of the 26th, were you present when the CI contacted Mr. Nevilles?

A: Oh, yes.

Q: And was it on multiple occasions?

A: There were actually -- actual communications, I believe it was three different occasions.

13

Q: Okay. Are those included in this Complaint, all of them?

A: Let's see here. Well, in the Complaint, we indicated that the conversation was monitored by law enforcement officers.

Q: A conversation. And there was more than one conversation?

A: Yes, ma'am.

Q: And you did not include all conversations or all contacts in the Criminal Complaint for federal charges?

A: No.

Q: Do you generally lay out one hundred percent of your investigative file in a criminal complaint?

A: No, ma'am.

Q: You lay out different things in a criminal complaint that you would in a search warrant?

A: Sure.

\* \* \*

Q: Okay. Now, were you present earlier this morning during an interview of Ms. Tammy Simpson?

A: Yes.

Q: Okay. And what did you learn during that interview regarding Ms. Simpson's position as to whether she had been at Mr. Nevilles' house within five days of this deal going on?

A: In the interview, she said that she had not said that.

Q: She said that in the interview this morning?

A: Right.

Q: And that's the first time that you became aware of that position?

14

A: Yes.

Q: Did that come as a surprise to you?

A: Very surprised.

Q: Why?

A: Well, because that's not what the original interview that we had with her indicated. And that's not what she had indicated then.

Q: Okay. Now, other things that she discussed during her interview this morning, did they seem consistent?

A: Yes.

(Hrg. tr. 78-82.)

\* \* \*

Q: Okay. So, the drugs were being stored and sold from inside, but she had never been inside?

A: Correct.

Q: Okay. And this morning when you were talking to Ms. Simpson, did she discuss a phone conversation that she had with Mr. Nevilles, after he had indicated his interest in buying the gun himself?

A: Yes. She said -- I am trying to recall. There were conversations over the phone, but I can't remember exactly which conversation it was that she was talking about.

Q: Okay. Do you remember her discussing the fact that she told Mr. Nevilles she wanted to get some hard?

A: Right.

Q: Okay. And that was along with the money?

A: Correct.

Q: To be exchanged for the gun?

15

A:   Correct.

Q:   Okay. And did that occur within five days of the deal in this case?

A:   Yes. I believe -- I think that it was two days prior to us becoming involved in it.

* * *

Q:   Okay. Now, let me ask you this, from speaking to Ms. Simpson this morning and learning of her position that she had not been in the house within five days, was it your -- and I want you to tell the Judge -- was it your impression that Ms. Simpson had been lying to you back in January or was it your impression that there had been some type of misunderstanding? Was it your impression that Helms had lied to her? What was your impression of the situation?

A:   Well, honestly, I mean, I don't think that she is lying, as far as Ms. Simpson. I know that on the day that we interviewed her, that that's what she told us. So, --

Q:   And you feel confident that that was the question, "Had you been at his residence within five days?"

A:   Exactly.

Q:   Okay. And present during the interview, it would have been yourself?

A:   Yes.

Q:   Detective Helms?

A:   Yes.

Q:   And Lieutenant Clark?

A:   Yes.

Q:   Okay. Would you say that Lieutenant Clark is somewhat famous for being concerned about that five-day question?

A:   Very concerned about that five-day question.

16

Q: And that's one of his pet peeves?

A: Yes. This is one of his pet peeves, as far as search warrants are concerned.

Q: Okay. When you typed up that warrant that Officer Helms ultimately signed, was there any doubt in your mind that it was your perception that Tammy Simpson had said that she had been there in five days?

A: No, ma'am.

Q: Do you still feel that way today?

A: Yes.

(Hrg. tr. at 83-85.)

As indicated above, to be constitutionally problematic, false statements must have been deliberately or recklessly included in the affidavit and must have served to undermine the finding of probable cause. See United States v. Carpenter, 360 F.3d 591, 596-97 (6th Cir.), cert. denied, ___ U.S. ___, 125 S.Ct. 261, 160 L.Ed.2d 84, 73 U.S.L.W. 3209 (U.S. Oct. 4, 2004) (No. 03-10798). While there was conflicting testimony concerning whether Simpson told the officers she had been to Nevilles' home within five days of the warrant's issuance, the Court does not find, to the extent the statement contained in the affidavit was in fact false, that it was deliberately or recklessly made. Rather, the totality of the evidence supports the conclusion that the statement was the result of confusion or a misunderstanding. Accordingly, because the Defendant has failed to show, as he must, "that the affiant either knowingly or with reckless disregard included a false statement in the affidavit," the Fourth Amendment was not violated and exclusion of the fruits of the search of the house on Bon Air is not warranted.[1] See Rodriguez-Suazo, 346 F.3d at 648.

---

[1] Based on the Court's conclusion, it need not consider whether the good faith exception to the exclusionary rule, as articulated by the Supreme Court in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), applies in this case. Moreover, as the Court has

17

## CONCLUSION

In sum, for the reasons set forth herein, the Defendant's motion to suppress is DENIED.

IT IS SO ORDERED this 21st day of June, 2005.

_____
J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

determined that the search warrant was valid, the arguments of the Defendant premised on a finding by the Court that the warrant violated the Fourth Amendment, including (1) that his warrantless arrest within the curtilage of his home was unconstitutional absent exigent circumstances and (2) that a search of the eave of the Bon Air house was improper on the grounds that it was not within his immediate control at the time of his arrest, need not be addressed.

18

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 77 in case 2:04-CR-20070 was distributed by fax, mail, or direct printing on June 21, 2005 to the parties listed.

---

Eric Scott Hall
WAGERMAN LAW FIRM
200 Jefferson Ave.
Ste. 1313
Memphis, TN 38103

Jennifer Lawrence Webber
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Honorable J. Breen
US DISTRICT COURT